Argued and submitted January 29, reversed and remanded for new trial April 1, petition for review allowed July 21, 1998 (327 Or 431)

STATE OF OREGON,
*Respondent,*

*v.*

GABRIEL GHERASIM,
*Appellant.*

(C951646CR; CA A94556)

956 P2d 1054

Jesse Wm. Barton, Deputy Public Defender, argued the cause for appellant. With him on the brief was Sally L. Avera, Public Defender.

Ann Kelley, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Virginia L. Linder, Solicitor General.

Before De Muniz, Presiding Judge, Haselton, Judge, and Rossman, Senior Judge.

HASELTON, J.

## HASELTON, J.

Defendant appeals his convictions of kidnaping in the first degree, ORS 163.235; attempted rape in the first degree, ORS 163.375; sexual abuse in the first degree, ORS 163.427; assault in the fourth degree, ORS 163.160; and menacing, ORS 163.190. He asserts principally that the trial court erred in excluding expert testimony that the complainant, Garcia, was affected by dissociative amnesia, a condition that impairs the ability to recall and recount events accurately. We conclude that the exclusion of that evidence was erroneous and that that error was not harmless. Accordingly, we reverse and remand for a new trial.

Defendant's convictions arise out of events on the night of July 12, 1995. There is no dispute that Garcia was physically and sexually assaulted or that defendant gave Garcia a ride that night. The only question at trial was whether defendant was the person who assaulted Garcia. At trial, Garcia identified defendant as her assailant, but defendant denied any culpability, testifying that he was, instead, a "good Samaritan" who found Garcia by the side of the road after she had been assaulted. Because there were no witnesses to the assault and there was no forensic evidence, the accuracy of Garcia's account and, particularly, her in-court identification of defendant, was critical.

In challenging Garcia's testimony, defendant sought to introduce the opinion of Dr. Hugh Gardner, a psychiatrist, that Garcia had experienced dissociative amnesia, a psychological condition in which victims involuntarily block from their conscious minds the details of traumatic events, with the resulting memory gaps being filled with details from later events ("dissociation").[1] Gardner's opinion rested, primarily, on various accounts Garcia gave of the traumatic events and on seeming discrepancies in those accounts. The trial court, as amplified below, excluded Gardner's testimony, concluding that it represented an impermissible comment on Garcia's credibility and that it was within the common understanding of an average juror. *See* 153 Or App at 320. Before

---

[1] Dissociative amnesia is a recognized diagnosis appearing in the *Diagnostic and Statistical Manual of Mental Disorders* 478 (4th ed 1994) (DSM-IV).

addressing the particulars of Gardner's putative testimony and the merits of the court's ruling, we briefly recount Garcia's various accounts of what happened on the night of July 12.

Garcia gave her first account to Officer Noragon of the Tualatin Police Department within an hour after the attack on July 12. Noragon's police report reflects the following statements: Garcia told Noragon that her assailant spoke to her using very good Spanish. She said that he drove a big green car—big enough for her to stand up in. She described her assailant's clothing as a long-sleeved shirt of indeterminate color, possibly white, and possibly a tie and a vest. Garcia said that her assailant slapped and hit her and then held a knife to her neck and her waist and told her to remove her clothes and to sit on his lap. She described the knife as 12 inches long and 1 to 1½ inches wide, with a brown handle and white blade. Garcia told Noragon that her assailant's pants were open, but his underwear were on. Using her bent finger, she gestured for Noragon that her assailant's penis was not erect.

Garcia next related the events before the grand jury on July 25, 1995.[2] She testified that her assailant wore a long-sleeved shirt and a vest. When she got inside the car, she put on a seat/shoulder belt. His Spanish was good. He put a white knife with a brown handle against her side. He told her to take off her panties and sit on top of him.

At trial, on May 16 and 17, 1996, Garcia testified that her assailant could not speak Spanish very well. She denied having told Noragon that her assailant wore a long-sleeved shirt, vest and tie or that he drove a big green car. Garcia confirmed that the car was green, but stated that she could not remember the size of the car. She testified that she

---

[2] Linda Kluth, clerk of the grand jury, testified, and her notes of Garcia's testimony before the grand jury were admitted as evidence. Generally, grand juror proceedings are secret and grand jurors may not be questioned about proceedings. *See* ORS 132.060; ORS 132.310. However, the trial court allowed Kluth's testimony and the admission of her notes under ORS 132.220(1), which provides that a member of a grand jury may be required to disclose testimony of witnesses before the grand jury "for the purpose of ascertaining whether it is consistent with that given by the witness before the court." Error has not been assigned to that ruling on appeal.

had not told police that her assailant's shirt was white or long-sleeved. She gave inconsistent testimony during cross-examination about whether she was always standing in her assailant's car, or sitting at first, but later standing. She denied having been hit with a fist, and gave inconsistent testimony about whether she had told police that she had been slapped. She denied having told police that her assailant's pants were open, that his penis was not erect, or that he told her to sit on his lap. She described the knife as about eight or nine inches long, with a brown handle and white blade. She could not identify defendant's knife. Garcia gave inconsistent testimony about whether there were seatbelts in her assailant's car: at first she testified that there were no seat belts, but later indicated that there may have been a shoulder belt only.

At trial, defendant testified that, when he saw Garcia, she was crouched by the side of the road next to a tree. Because she appeared to need help, he stopped and asked her if she was all right. She responded, "Tigard, Tigard," and defendant asked her if she needed a ride to Tigard. Garcia responded, "yes," and defendant unlocked the door so she could get in. As she entered his car, defendant realized that she was partially undressed and carrying some clothes. He told her he would pull off onto a side street so that she could put her clothes on with some privacy. He stopped the car so that she could put her clothes on, and Garcia became agitated, screaming at defendant and pounding him with her fists. Eventually, because defendant was afraid for his safety, he showed her a knife that he kept in the car, and then Garcia threw her clothes in his face and ran from the car. Shortly thereafter, defendant located a police officer and told him about the encounter. Defendant also testified that, although he speaks Romanian (he was born in Romania) and Italian fluently, he does not speak Spanish.

During the defense case-in-chief, defendant sought to introduce the testimony of Dr. Hugh Gardner, a psychiatrist, who had testified as an expert in several hundred trials. After hearing defense counsel's description of the expected content of Gardner's testimony, the court expressed concerns that *State v. Munro*, 68 Or App 63, 680 P2d 708, *rev den* 297

Or 459 (1984), might preclude the admission of that testimony. The court then invited an offer of proof, which included the following testimony and colloquy:

"Q. [by defense counsel]. Doctor, have you had a chance to review * * * a transcript of the testimony of [Garcia] and the police reports in this case?

"A. Yes.

"Q. After reviewing the police reports * * * do you have an opinion with respect to [Garcia], as to whether or not she suffered from any disorders as a result of the incident?

"A. Yes, I do.

"Q. Would you please tell us that opinion?

"A. My opinion, from looking at this material, is that she suffers from a dissociative amnesic disorder.

"Q. Why?

"A. The information would seem to indicate a degree of amnesia or lack of memory of what went on, conflicting kinds of responses to what went on at that incident. She admits in her testimony, on a number of occasions, that she was very nervous, very frightened, that her mind wasn't functioning or on what was going on, which is not uncommon * * * after a traumatic incident of this nature, with normal people.

"Q. Do I need to go into further details, Your Honor, or does this sufficiently —

"A. [by the court]. It's your choice, Mr. Hingson. I think you need to find a way to fit this within the [State v.] Middleton[, 294 Or 427, 657 P2d 1215 (1983)] framework, and avoid the difficulty of State v. Munro. And so far, you're not making much progress. If you read the language of Munro, it's fairly clear you can't be commenting on the credibility of a particular witness, and that seems to be what he's doing here. If there is any way you can offer his testimony as to a class of persons that won't become a comment on her credibility, I'll permit you to do that, but that's the challenge you have.

"Q. Dr. Gardner, under our legal standards, the law does not permit a witness to testify with respect to the credibility or truthfulness of a particular witness. Are you testifying to that effect here?

"A. [by witness]. No. No. I think that the transcript and the written statement of the * * * victim, there is no question as to her, in my opinion, conscious intent at truthfulness. I think that the inconsistencies that appear in the police reports and in her own words, saying, 'I don't remember,' validate my conclusion in terms of the diagnosis. I think she's credible in term of her efforts to do the best she can. It's not a question of truthfulness. It's a question of her mental ability to perform, having experienced what would appear to be a traumatic encounter.

"Q. If a group of individuals had suffered a traumatic encounter, such as being kidnaped and being sexually assaulted, would a person that had been subjected to that kind of an assault have emotional factors that would influence their ability to remember the events with precision?

"A. Yes.

"Q. And would this hold true with respect to a group of people, as opposed to a particular individual?

"A. Yes.

"* * * * *

"Q. Dr. Gardner, do you believe that [Garcia's] conduct, as it relates to having this dissociative amnesia, compares with similarly situated people who have been subjected to violent attacks?

"A. Yes."

The trial court excluded the testimony, concluding that it was inadmissible under *Munro* and that it was so within the common experience of jurors that it would not assist the factfinding process:

"[*Munro*] is squarely on point with what this doctor is saying: that because of her experience, she is either confused or unable to remember certain events. And at least the Court of Appeals, in this opinion, found that not to be admissible testimony.

"I guess my other concern here is the potential for misleading the jury. If I were to allow this testimony at all, it would be with the doctor being permitted to testify that people who go through stressful events have trouble remembering, without relating it to this particular person, [Garcia]. And then both sides could use that testimony to argue to the jury about what she doesn't remember from the event and what the defendant doesn't remember from the event, because they both, by their testimony, went through a stressful event.

"So I don't think that aids the jury. It doesn't assist the jury in reaching a factual determination, more than the average person on this jury can conclude from their own experience that when you go through a stressful event, sometimes it's difficult to remember parts of it."

On appeal, the evidentiary issues are tightly circumscribed. There is no dispute either that dissociative amnesia is a recognized psychiatric condition or that Gardner, who had testified as an expert in hundreds of trials, was qualified to testify on that subject and, specifically, to render an opinion that Garcia suffered from dissociative amnesia. Rather, the only issues are: (1) Did Gardner's testimony represent an impermissible "direct comment" on Garcia's credibility; and (2) if not, would that testimony have assisted the jury? We disagree with the trial court on both issues.

■ Gardner did not "give an opinion on whether he believe[d that Garcia was] telling the truth." *Middleton*, 294 Or at 438. His testimony related, instead, to Garcia's ability to accurately perceive, remember, and recount the critical events. In that regard, Garcia's testimony was no different from that of an ophthalmologist who testifies that an eyewitness has impaired vision or that of a psychologist who testifies that a witness suffers from dementia. *See State v. Longoria*, 17 Or App 1, 20-21, 520 P2d 912, *rev den* (1974) ("In a proper case, where there is an indication that a witness suffers mental impairment affecting his testimonial capability, it may be proper to allow psychiatric or psychological evidence to assist the jury in assessing the ability of that witness to perceive, remember and relate."). Although it is true that, if the jurors believed Gardner's testimony, they would be less likely to believe Garcia (or, conversely, more likely to believe defendant),

"[m]uch expert testimony will tend to show that another witness either is or is not telling the truth. This, by itself, will not render evidence inadmissible." *Middleton*, 294 Or at 435 (citation omitted).

We have consistently acknowledged the admissibility of such "capacity" evidence. *See generally State v. Harwood*, 45 Or App 931, 940, 609 P2d 1312, *rev den* 289 Or 337 (1980) ("Expert evidence relating to a witness' credibility is admissible if it goes to the ability of the witness to perceive, remember or relate."). *James v. General Motors of Canada, Ltd.*, 101 Or App 138, 145-46, 790 P2d 8, *rev den* 310 Or 243 (1990), is exemplary. There, we rejected the plaintiff's argument that the trial court had erred in admitting expert testimony as to the traumatic effects of a brain injury on her post-accident recollection:

> "Plaintiff also contends that the court erred by allowing two of defendants' witnesses to testify about her credibility. We do not agree that that is what they testified about. The two were experts; they testified concerning the effect of plaintiff's brain injury on her ability to make statements, immediately after the accident, that bore a relationship to reality. The testimony also explored the effect of the injury on her memory. Plaintiff presented expert testimony on the same subject. The evidence was admissible." *Id.* (footnote omitted).

Similarly in *State v. Padilla*, 74 Or App 676, 679, 704 P2d 524 (1985), we sustained the admission of expert testimony by a counselor that the child victim had the capacity "to perceive and to relate accurately" a sexual contact. In so holding, we emphasized that the expert "did not state an opinion as to whether the victim would testify truthfully at trial." *Id. See also State v. Brown*, 64 Or App 747, 749, 669 P2d 1190 (1983), *aff'd* 297 Or 404, 687 P2d 751 (1984) (suggesting that a psychologist's testimony about "unconscious transference"— when a person seen in one situation is mistakenly identified as a person seen in another circumstance—would have been admissible had there been evidence that the victim had had prior contact with the defendant).[3]

---

[3] *Cf. State v. Wilson*, 121 Or App 460, 855 P2d 657, *rev den* 318 Or 61 (1993), in which we upheld the trial court's admission of expert witness testimony that the expert had diagnosed the complaining witness as having been sexually abused and explaining that diagnosis:

The state argues, nevertheless, that *Munro* compelled the exclusion of Gardner's testimony. In *Munro*, the defendant, who was charged with rape, sodomy, and sexual abuse, sought to introduce testimony by a counselor who had treated the child complainant. The counselor would have testified about the complainant's mental state "and its effect on her perceptions and truth-telling." *Munro*, 68 Or App at 66. The trial court excluded that evidence, and we affirmed. In so holding, we emphasized that the counselor's testimony did not pertain to a "typical reaction of child victims" (as in *Middleton*) and that that testimony amounted to "an opinion on the veracity of a *particular* witness, rather than a general opinion on how the conduct of a witness compares with similarly situated members of an identifiable group." *Id.* (emphasis in original).

Without commenting on any other aspect of *Munro*, we note that *Munro* is materially—indeed, dispositively—distinguishable in at least one respect. In *Munro*, the counselor's testimony did not attempt to relate the victim's "mental state and its effect on her ability to tell the truth," *id.* at 65, to some more general phenomenon or condition—to a condition or impairment typically experienced by "similarly situated members of an identifiable group." *Id.* at 66. Here, in contrast, Gardner did specifically identify a well-recognized condition, dissociative amnesia, that is typically, albeit not necessarily, experienced by persons who, like Garcia, have been victims of traumatic events. Gardner further related Garcia's particular circumstances to that more general psychiatric phenomenon and, in so doing, did not express any ultimate or direct opinion as to whether Garcia's account including her identification of defendant was truthful.[4]

---

"[The expert] testified that * * * she diagnosed the child as having been sexually abused. Although, if believed, [the expert's] testimony supported the child's testimony, that does not render it a *direct* comment on the child's credibility. It was an opinion as to the proper medical diagnosis. A medical doctor is not precluded from testifying as to her medical diagnosis simply because the jury may infer from that testimony that another witness is or is not telling the truth. Defendant had the opportunity to cross-examine [the expert] regarding the basis of her diagnosis."

*Id.* at 465 (emphasis in original).

[4] On cross-examination during the offer of proof, the prosecutor elicited a response from Gardner that he believed Garcia's account was not accurate because

Gardner's putative testimony fully comported with *Munro's* requirements.

■       The state contends, alternatively, that regardless of whether Gardner's testimony represented an impermissible comment on Garcia's credibility, the trial court properly excluded that testimony because its content was within the common understanding of an average juror—that is, that Gardner's testimony would not have "assist[ed] the trier of fact to understand the evidence or to determine a fact in issue." OEC 702. Again, we disagree.

Although it may be commonly understood that people who experience traumatic events are sometimes confused about the details of those events, the medical/psychiatric dynamics of that phenomenon—and, particularly, how they might be related to a particular individual's circumstances—are not a matter of common knowledge. By analogy: It might be commonly known that people who have been exposed to asbestos sometimes develop cancer, but the question of whether a particular shipyard worker has cancer, and whether that cancer was caused by exposure to asbestos, is a matter of expert medical opinion and diagnosis. Here, Gardner's expert opinion was essential in relating Garcia's particular circumstances to a diagnosis of dissociative amnesia and in explaining the implications of that diagnosis. Consequently, although trial courts have considerable discretion with respect to screening expert testimony under OEC 702, *see, e.g., Butler v. Dept. of Corrections,* 138 Or App 190, 204-05, 909 P2d 163 (1995), we conclude that the court erred in excluding Gardner's testimony. *See generally Middleton,* 294 Or at 436 (sustaining admission of expert psychological testimony: "Explaining this superficially bizarre behavior by identifying its emotional antecedents could help the jury better assess the witness's credibility.").

■       We further conclude that the error was not harmless. As noted previously, because there were no witnesses to the assault and because there was no forensic evidence,

---

"I believe that she has confused a situation because of an amnesic problem." However, that testimony, which might approximate a "direct comment," was not elicited by *defense counsel,* and defense counsel in fact carefully avoided eliciting such a response. *See* 153 Or App at 317-19 (reproducing colloquy).

Garcia's testimony was critical to the prosecution. Conversely, and necessarily, Gardner's testimony lay at the heart of the defense. *Cf. Crane v. Kentucky*, 476 US 683, 106 S Ct 2142, 90 L Ed 2d 636 (1986) (addressing criminal defendant's due process right to present a complete defense). A new trial is required.

Defendant raises several other issues. Because those assignments pertain to matters that may not recur on retrial, we do not address them.

Reversed and remanded for new trial.