Argued and submitted January 8, decision of Court of Appeals affirmed, judgment
of circuit court reversed and case remanded to circuit court for new trial
July 29, 1999

### STATE OF OREGON,
*Petitioner on Review,*

*v.*

### GABRIEL GHERASIM,
*Respondent on Review.*

### (CC C951646CR; CA A94556; SC S45379)

985 P2d 1267

Ann Kelley, Assistant Attorney General, Salem, argued
the cause and filed the petition for petitioner on review. With

her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Jesse Wm. Barton, Deputy Public Defender, Salem, argued the cause and filed the petition for respondent on review. With him on the brief was David E. Groom, State Public Defender.

Before Carson, Chief Justice, and Gillette, Van Hoomissen, Durham, Leeson, and Riggs, Justices.**

LEESON, J.

---

** Kulongoski, J., did not participate in the consideration or decision of this case.

## LEESON, J.

The issue in this criminal case is whether the trial court erred by not allowing defendant's expert witness to testify that the victim suffered from dissociative amnesia. The Court of Appeals held that the trial court erred and reversed and remanded the case for a new trial. *State v. Gherasim*, 153 Or App 313, 956 P2d 1054 (1998). We affirm.

Defendant was charged with first-degree kidnaping, ORS 163.235; attempted first-degree rape, ORS 161.405 and ORS 163.375; first-degree sex abuse, ORS 163.427; fourth-degree assault, ORS 163.160; and menacing, ORS 163.190. It is uncontested that the victim was assaulted physically and sexually on the night of July 12, 1995, and that the victim was in defendant's car that night. The disputed issue at trial was whether defendant or someone else assaulted the victim.

At trial, the victim identified defendant as her assailant. Defendant maintained that someone else had assaulted the victim before he came on the scene and tried to assist her. Neither the victim nor defendant presented eyewitnesses or forensic evidence at trial. Consequently, whether the jury believed the victim's or defendant's account of what had occurred was critical to its determination whether defendant was guilty of the crimes.

The victim's statements to the police on the night of the assault and her grand jury and trial testimony several months later contained discrepancies. The Court of Appeals summarized those discrepancies as follows:

"[The victim] gave her first account to Officer Noragon of the Tualatin Police Department within an hour after the attack on July 12[, 1995]. Noragon's police report reflects the following statements: [The victim] told Noragon that her assailant spoke to her using very good Spanish. She said that he drove a big green car—big enough for her to stand up in. She described her assailant's clothing as a long-sleeved shirt of indeterminate color, possibly white, and possibly a tie and a vest. [The victim] said that her assailant slapped and hit her and then held a knife to her neck and her waist and told her to remove her clothes and to sit on his lap. She described the knife as 12 inches long and 1 to ½ inches wide, with a brown handle and white blade.

[The victim] told Noragon that her assailant's pants were open, but his underwear [was] on. Using her bent finger, she gestured for Noragon that her assailant's penis was not erect.

"[The victim] next related the events before the grand jury on July 25, 1995. She testified that her assailant wore a long-sleeved shirt and a vest. When she got inside the car, she put on a seat/shoulder belt. His Spanish was good. He put a white knife with a brown handle against her side. He told her to take off her panties and sit on top of him.

"At trial, on May 16 and 17, 1996, [the victim] testified that her assailant could not speak Spanish very well. She denied having told Noragon that her assailant wore a long-sleeved shirt, vest and tie or that he drove a big green car. [The victim] confirmed that the car was green, but stated that she could not remember the size of the car. She testified that she had not told police that her assailant's shirt was white or long-sleeved. She gave inconsistent testimony during cross-examination about whether she was always standing in her assailant's car, or sitting at first, but later standing. She denied having been hit with a fist, and gave inconsistent testimony about whether she had told police that she had been slapped. She denied having told police that her assailant's pants were open, that his penis was not erect, or that he told her to sit on his lap. She described the knife as about eight or nine inches long, with a brown handle and white blade. She could not identify defendant's knife. [The victim] gave inconsistent testimony about whether there were seatbelts in her assailant's car: at first she testified that there were no seat belts, but later indicated that there may have been a shoulder belt only."

*Gherasim*, 153 Or App at 316-17 (footnote omitted). The Court of Appeals also summarized defendant's version of what occurred:

"At trial, defendant testified that, when he saw [the victim], she was crouched by the side of the road next to a tree. Because she appeared to need help, he stopped and asked her if she was all right. She responded, 'Tigard, Tigard,' and defendant asked her if she needed a ride to Tigard. [The victim] responded, 'yes,' and defendant unlocked the door so she could get in. As she entered his car, defendant realized that she was partially undressed and carrying some clothes. He told her he would pull off onto a side street so

that she could put her clothes on with some privacy. He stopped the car so that she could put her clothes on, and [the victim] became agitated, screaming at defendant and pounding him with her fists. Eventually, because defendant was afraid for his safety, he showed her a knife that he kept in the car, and then [the victim] threw her clothes in his face and ran from the car. Shortly thereafter, defendant located a police officer and told him about the encounter. Defendant also testified that, although he speaks Romanian (he was born in Romania) and Italian fluently, he does not speak Spanish."

*Id.* at 317.

At trial, defendant sought to introduce the testimony of an expert witness, a psychiatrist, who would testify that the victim experienced dissociative amnesia, a condition that affected her ability to recall accurately at trial what had occurred on the night that she was assaulted. The state objected to allowing defendant's expert witness to testify. The trial court expressed its concern that the expert's testimony would be an impermissible comment on the victim's credibility. The trial court allowed defendant to make an offer of proof by having his expert testify outside the presence of the jury, followed by cross-examination by the state and re-examination by defendant. Defendant initially inquired of the expert as follows:

"Q.  Doctor, have you had a chance to review * * * a transcript of the testimony of [the victim] and the police reports in this case?

"A.  Yes.

"Q.  After reviewing the police reports, * * * do you have an opinion with respect to [the victim], as to whether or not she suffered from any disorders as a result of the incident?

"A.  Yes, I do.

"Q.  Would you please tell us that opinion?

"A.  My opinion, from looking at this material, is that she suffers from a dissociative amnesic disorder.

"Q.  Why?

"A. The information would seem to indicate a degree of amnesia or lack of memory of what went on, conflicting kinds of responses to what went on at that incident. She admits in her testimony, on a number of occasions, that she was very nervous, very frightened, that her mind wasn't functioning or on what was going on, which is not uncommon * * * after a traumatic incident of this nature, with normal people."

After that exchange, defendant asked the trial court whether the expert's testimony satisfied the trial court's concerns. The court instructed defendant that he needed to fit the testimony into the framework provided by *State v. Middleton*, 294 Or 427, 657 P2d 1215 (1983) (expert may testify generally about how mental or emotional factors might influence behavior of member of identifiable group), and to avoid the difficulties of *State v. Munro*, 68 Or App 63, 680 P2d 708, *rev den* 297 Or 459 (1984) (witness cannot comment on credibility of another witness). Defendant continued his examination of the expert:

"Q. [U]nder our legal standards, the law does not permit a witness to testify with respect to the credibility or truthfulness of a particular witness. Are you testifying to that effect here?

"A. No. No. I think that the transcript and the written statement of the * * * victim, there is no question as to her, in my opinion, conscious intent at truthfulness. I think that the inconsistencies that appear in the police reports and in her own words, saying, 'I don't remember,' validate my conclusion in terms of the diagnosis. I think she's credible in term[s] of her efforts to do the best she can. It's not a question of truthfulness. It's a question of her mental ability to perform, having experienced what would appear to be a traumatic encounter.

"Q. If a group of individuals had suffered a traumatic encounter, such as being kidnaped and being sexually assaulted, would a person that had been subjected to that kind of an assault have emotional factors that would influence their ability to remember the events with precision?

"A. Yes.

"Q. And would this hold true with respect to a group of people, as opposed to a particular individual?

"A.    Yes."

The state's cross-examination included the following:

"Q.    * * * Would you repeat for me the words of what you called the disorder, * * *

"A.    Dissociative amnesia.

"* * * * *

"Q.    Is it a condition or a disorder?

"A.    It's a condition.

"Q.    A condition. So when you say 'dissociative amnesia,' is that a diagnosis?

"A.    Yes.

"Q.    A medical diagnosis?

"A.    Yes.

"Q.    Are you making a medical diagnosis in this case?

"A.    It's a medical opinion.

"Q.    Can you tell the jury that you are diagnosing [the victim] with dissociative amnesia?

"A.    I can tell the jury that from the information available to me, it would appear that that condition pertains to the situation.

"Q.    But you can't tell them that you are diagnosing her as suffering from that?

"A.    Well, 'suffering' is an ongoing term. It [is] related to this incident and her recall of the incident, that she does have an amnesic problem, it would seem, by virtue of my looking at her written information, the police information, and the transcripts of her testimony.

"Q.    So you are giving an opinion about her mental ability to perform when she is reporting the crime, her mental ability to —

"A.    Her recall of the incident.

"Q.    —to recall.

"A.    Memory.

"Q. So you're saying that she cannot recall the incident?

"A. Yes.

"Q. And, in your opinion, she's confused about what she's saying?

"A. It's my opinion that she's confusing the events.

"Q. The events? Which events?

"A. The activities of the defendant here and the activities wherein she was assaulted.

"Q. Well, where do you find the information on the police reports or her transcript that there were two separate events?

"A. She describes different information than would apparently pertain to the arrest of the defendant.

"Q. I'm sorry. I don't understand what you mean.

"A. For instance, she doesn't describe a colored shirt, and the defendant apparently was wearing one. She doesn't describe the seat belt in his car. There is quite a bit of questioning about a seat belt situation, and she says that the only type of seat belt she knows about is one that goes around your waist. And then she's—it looks like sort of led in questioning, one way or another.

"It would be my opinion that she's combining two incidents—one of a rescue situation, one of an attack situation—in her mind, retrospectively. It seems as though she's confused the two together.

"Q. So the bottom line is that you don't believe the story that she's telling?

"A. I believe that she believes what she's saying.

"Q. But you believe that that's not the truth?

"A. I didn't say anything about truth. I believe that she's telling the truth as she knows it.

"Q. But you believe that that isn't the truth?

"A. No. I believe that she has confused a situation because of an amnesic problem.

"Q. You believe that there are other facts that she's not talking about?

"A. No. I don't think she's doing anything volitionally.

"Q. You believe that there are other facts that she is not able to talk about?

"A. I think there are other facts that she doesn't remember."

On redirect examination, defendant asked the expert:

"Q. [D]o you believe that [the victim's] conduct, as it relates to having this dissociative amnesia, compares with similarly situated people who have been subjected to violent attacks?

"A. Yes."

The trial court concluded that the opinions that the expert stated during cross-examination, namely, that the victim was combining a "rescue situation" and an "attack situation," and that "there are other facts that she doesn't remember," were impermissible comments on the victim's credibility. Consequently, it excluded the expert's testimony. The court explained that, if it were to permit the expert to testify, then it would limit the testimony to the expert's generalized opinion that "people who go through stressful events have trouble remembering." The court concluded that such a general statement would not be helpful to the jury, because both defendant and the victim had experienced stress on the night of July 12, 1995, and both could use that statement to argue that the other did not remember accurately what had occurred. Finally, the court stated that "the average person on [the] jury can conclude from their own experience that when you go through a stressful event, sometimes it's difficult to remember parts of it."

On appeal, defendant argued that the trial court erred in excluding the testimony of defendant's expert witness that, in his opinion, the victim suffered from dissociative amnesia. The Court of Appeals agreed. It explained that dissociative amnesia "is a recognized diagnosis appearing in the *Diagnostic and Statistical Manual of Mental Disorders*, 478 (4th ed 1994) (DSM-IV)." *Gherasim*, 153 Or App at 315 n 1.

According to the Court of Appeals, dissociative amnesia is "a psychological condition in which victims involuntarily block from their conscious minds the details of traumatic events, *with the resulting memory gaps being filled with details from later events ('dissociation')." Id.* at 315 (emphasis added).

We do not find the foregoing emphasized material in the DSM-IV. Nor did defendant's expert assert that one of the characteristics of dissociative amnesia is that memory gaps are filled with details from later events. The DSM-IV describes the "predominant disturbance" associated with dissociative amnesia as "one or more episodes of inability to recall important personal information, usually of a traumatic or stressful nature, that is too extensive to be explained by ordinary forgetfulness." *DSM-IV* at 481. Dissociative amnesia "most commonly presents as a retrospectively reported gap or series of gaps in recall for aspects of the individual's life history. These gaps are usually related to traumatic or extremely stressful events." *Id.* at 478.

The Court of Appeals held that the expert's testimony about his diagnosis of dissociative amnesia was admissible as "capacity" evidence, because it related to the victim's "ability to accurately perceive, remember, and recount the critical events." *Gherasim*, 153 Or App at 320-21. Therefore, the Court of Appeals reversed and remanded the case for a new trial.

The state sought review on the ground that the expert's diagnosis of dissociative amnesia, which he gave on direct examination during the offer of proof, and the consequences of that diagnosis, which he gave during cross-examination, "reasonably could be considered an impermissible comment" on the victim's credibility. The state took no exception to the expert's testimony, given during re-direct examination, about the general behavior of a group of people who suffer traumas similar to the one that the victim suffered. In the alternative, the state sought review on the ground that the trial court did not abuse its discretion in finding that the testimony of defendant's expert about his diagnosis of dissociative amnesia would be "confusing, commonly understood, or otherwise not helpful." In its brief on the merits, the state

concedes that it is "willing to assume that the [expert's] testimony was not improper credibility testimony." In light of the state's concession, the issue on review is whether the trial court erred in refusing to admit the expert's testimony about his diagnosis that the victim suffered from dissociative amnesia on the ground that it would not have been helpful to the jury.

■■ We review the trial court's order to exclude expert testimony to determine whether the court applied the correct principles of law and did not abuse its discretion. *See Yundt v. D & D Bowl, Inc.*, 259 Or 247, 256, 486 P2d 553 (1971) (explaining standard of review); *see also Madrid v. Robinson*, 324 Or 561, 563, 931 P2d 791 (1997) (court reviews exclusion of expert testimony to determine whether trial court applied correct principle of law). Expert testimony is admissible if the expert's opinion "will assist the trier of fact to understand the evidence or to determine a fact in issue." OEC 702; *see also Middleton*, 294 Or at 435 ("the test is whether the expert's testimony, if believed, will be of help or assistance to the jury") (quoting *State v. Stringer*, 292 Or 388, 391, 639 P2d 1264 (1982)).

■ In this case, we conclude that the expert's testimony about his diagnosis of dissociative amnesia would have been helpful and that its exclusion was not harmless. The determination of defendant's guilt primarily depended on whether the jury believed the victim's or defendant's version of what had occurred. Defendant's expert would have testified that, in his opinion, the victim suffered from dissociative amnesia and that that condition affected her capacity to remember what had occurred on the night that she was assaulted. The testimony was evidence that defendant was entitled to present to the jury. *See Middleton*, 294 Or at 436 (explaining that emotional antecedent of behavior could help jury assess witness's credibility). The state argues that the expert's testimony would not have been helpful, because the expert "offered his diagnosis without telling the court what the diagnosis meant." Although the expert did not explain his diagnosis in detail, that lack of detail did not render his testimony "unhelpful" to the jury.

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for a new trial.