584 November 17, 2016 No. 72

IN THE SUPREME COURT OF THE
STATE OF OREGON

STATE OF OREGON,
*Petitioner on Review,*

*v.*

LANE EDWARD JESSE,
*Respondent on Review.*

(CC C110695CR; CA A153759; SC S063856)

En Banc

On review from the Court of Appeals.*

Argued and submitted September 22, 2016.

Peenesh Shah, Assistant Attorney General, Salem, argued the cause and filed the brief for petitioner on review. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Neil F. Byl, Deputy Public Defender, Salem, argued the cause and filed the brief for respondent on review. Also on the brief was Ernest G. Lannet, Chief Defender, Office of Public Defense Services.

BREWER, J.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is affirmed.

_____
* Appeal from Washington County Circuit Court, Rick Knapp, Judge. 275 Or App 1, 362 P3d 1187 (2015).

**BREWER, J.**

The issue on review following defendant's conviction for first-degree sexual abuse is whether the trial court erred in excluding from evidence at trial, on the ground that it was not helpful to the jury, expert testimony that defendant proffered in support of his theory that certain statements that he had made were not, in fact, actual confessions of guilt. OEC 702.[1] Because we conclude that the trial court did not err in excluding the proffered testimony, we affirm defendant's conviction.

## I. FACTS AND PROCEDURAL HISTORY

Defendant was indicted in April 2011 on one count of first-degree sexual abuse, based on an allegation that he knowingly subjected his daughter M to sexual contact. Because defendant argues that the excluded expert testimony would have helped explain his own statements that the state characterized as confessions of guilt, we describe those statements in detail.

A. *Statements that the State Claimed Were Confessions to the Charged Offense*

1. *Defendant's initial disclosure to S*

Defendant and his wife, S, were married for eight years and have two children, M and L. M was four years old in November 2009, when S returned home from work one morning and found defendant extremely upset. As S later described the discussion, defendant told her that she would never forgive him, handed over his wedding ring, and then told her that he had touched M over her diaper. S testified that defendant also said that he had been thinking about touching the children for some time and that he was worried about "turning into his [own] family." According to S, defendant said that "he belonged in prison and to call the police right now." S did not call the police, because defendant told

---

[1] OEC 702 provides that,

"[i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise."

her that M had not awakened and did not know about the touching, and defendant agreed to leave the house.

### 2.  *Signed admission*

S agreed to stay married to defendant for a short time so that he could seek counseling using her health insurance. S testified that she insisted, however, that she "needed some sort of proof that says that [defendant] did this so that *** he couldn't come back later and say that he wanted the kids." S testified that she wrote the following statement for defendant to sign:

> "I, [defendant], am admitting to touching my oldest daughter, [M], in an inappropriate way. I went in her room early in the morning and was tucking her into bed when I ran my hand over her diaper, over her pubic area. I then walked out and went to bed. My daughter did not wake up. I have never done this before. When my wife came home from work, I told her. She told me to leave and I agreed to that and to get counseling. I am writing this so my wife, [S,] has proof for the protection of our children."

S also testified that she read the document out loud to defendant, and then defendant read and signed it. In his trial testimony, defendant denied that S showed him the document, and he asserted that his signature was forged.

### 3.  *M's disclosures*

S and defendant dissolved their marriage in March 2010. On September 11, 2010, M told S, "Well, one time I was in bed with daddy and—and he put his hand down my diaper." M moved her hand over her pubic area to show S how defendant had touched her and said that defendant's hand was on "her private." M said that defendant did not take his hand out, so M pulled his hand out of her diaper. M told S that she did not tell about the incident sooner because she was afraid that defendant "would have to go away." A few days later, before S called the police, she had M repeat the story. M's story was the same except for an added detail about defendant saying, "I'm sorry."

M described the incident similarly in a recorded conversation during a medical examination on September 20, 2010, and in testimony at trial. The physician did not find any

physical signs of abuse, but testified that that was consistent with an allegation of touching the outside of the vagina.

### 4.  *Defendant's statements to sheriff's deputies*

Defendant was arrested on April 3, 2011, and he was confined in the Washington County Jail. Nearly a year later, while still in jail and awaiting trial in this case, defendant approached two deputies. According to the deputies, defendant asked, "What happens if I confess right now?" The deputies testified that, a few minutes later, defendant approached them again and said, "I did it. I confess." A deputy told defendant that the matter was between him and the courts. Defendant continued to pace the unit, approached the deputies again, and said (again, as the deputies described it), "Okay. I touched my daughter. I admit [it]. I'm a jerk."

## B.  *Dr. Callum's Pretrial Testimony*

Defendant attended 15 counseling sessions with Dr. Callum, a licensed psychologist, between December 2009 and July 2010, beginning shortly after the date of the charged offense. Defendant discussed with Callum issues of anxiety and marital difficulties. According to Callum, defendant told her that he was concerned about "thoughts" of touching his children, but assured Callum that he had "never" acted on the thoughts.

Before trial, the state filed a motion *in limine*, based in part on OEC 702, to exclude testimony by Callum concerning her clinical impressions of defendant. The state argued that "defendant will not be able [to] establish a sufficient nexus between [his] actions/behaviors and *** Callum's observations, opinions, discussions, recommendations, or beliefs surrounding her contacts with the defendant." The state contended that "Callum has not even provided a formal diagnosis, and if such a diagnosis were to be provided, *** there is not a satisfactory link that can be demonstrated between the diagnosis and the material events that occurred in this case"; thus, her "testimony is not assistive to the trier of fact and should be excluded."

The trial court held a pretrial hearing at which defendant elicited testimony from Callum through an

offer of proof. On direct examination, Callum testified that defendant

> "had very low self-esteem. He was also plagued by fears and many of the cognitions of his childhood, which kept on just ruminating [in] his head, and those were the fears and negative thoughts that he was always having. And which continuously made him wonder if he was okay, what was wrong with him."

Based on her clinical observations, Callum testified that defendant's "level of rumination" could "definitely lead him to become obsessive" and, at times, "be unhealthy." When Callum was asked whether defendant had "adequate coping skills and self-esteem to deal with personal issues," she testified, "No. No. A lot of the times he—he was very fearful, and he let *** the rumination of his thoughts plague. He could not let those things go."

On cross-examination during the offer of proof, Callum further explained that she had diagnosed defendant with an adjustment disorder and related mental health issues:

> "A. [CALLUM]: *** I diagnosed him as adjustment disorder with depressed mood. And I also diagnosed him with a trauma related to childhood physical and emotional abuse. And then the AXIS IV would be (indiscernible) experiencing marital difficulties or extramarital affairs.
>
> "Q. [PROSECUTOR]: What is adjustment disorder?
>
> "A. [CALLUM]: Adjustment disorder is when they have difficulty in [being] able to cope with the situation or where they have—just not being able to—to put everything together and they are letting it affect them. And you—and there's several—you can have adjustment disorder not otherwise specified, you can have adjustment disorder with anxiety and depression. You can have adjustment disorder with anxiety alone, you can have it with depression alone. You can also have it—adjustment disorder with a variety of emotions. And that is a very typical diagnosis when people are having difficulty in bringing it all together."

On further cross-examination, Callum addressed the relationship between defendant's mental health diagnoses and his statements to the jail deputies:

"Q. [PROSECUTOR]: Were you aware that [defendant] confessed in March of 2012 to touching his daughter, to two jail deputies, without them asking any questions?

"A. [CALLUM]: I heard about that, yes.

"\* \* \* \* \*

"Q. [PROSECUTOR]: I'm asking you whether you're factoring that in.

"A. [CALLUM]: And that's what I'm going to say. In regards to that confession, I would factor my knowledge about him, about his adjustment, you know his high degree of distress and so that—that would be where with my medical certainty would be he was very distressed. And whether he's confessing to something out of distress, that's within the realm of possibility."[2]

## C.  *The Trial Court's Ruling*

Following the offer of proof, the prosecutor reiterated that "there was no description by \* \* \* Callum, as to how this adjustment disorder would have affected [defendant's] likelihood of confessing, making false confessions, writing false confessions, anything." The prosecutor further contended that "there's been no evidence that would connect his mental health issues, or whatever he's going through, his adjustment disorder, to any sort of other behavior, of how that would affect his behavior throughout the course of trial—and again, that's what \* \* \* this witness is being proffered for."

The trial court then questioned whether defendant's adjustment disorder was relevant to an issue of fact in the case:

---

[2] The prosecutor also elicited the following opinion from Callum on cross-examination:

"Q. [PROSECUTOR]: And all that [a signed confession, disclosure of thoughts of sexually touching children, and the jailhouse admissions], even knowing that, today you're testifying under oath, that you believe to a reasonable degree of medical certainty that he did not abuse his children?

"A. [CALLUM]: That's correct."

Defense counsel conceded, however, at the conclusion of the hearing, that such an opinion was inadmissible "vouching" testimony and that the trial court should not treat it as part of his offer of proof. Accordingly, we do not consider that testimony in our analysis here.

"*** I'm looking at the diagnosis of his adjustment disorder with depression, thinking well, what does that have to do with anything. I'm looking at the—he was there to be treated by—he was there to be treated by Dr. Callum, the wife wasn't there for treatment, the child wasn't there for treatment, she had very little contact with either one of them in a treatment phase. Certainly she is not going to be able to get—as you said yourself, she can't give the opinion of what she—that she believes he didn't do the act, and all that kind of stuff.

"But, you know, the fact that he suffers from adjustment disorder with depression, has really nothing to do with this case. *** I'm having a hard time figuring out the rest of this, because I don't know what the rest—you were talking about you wanted to get into his psychological profile, and I'm thinking well, how is that relevant to his not understanding what he signed or—I mean, other than that, I don't know what it's relevant to."

Defense counsel replied that defendant's "psychological profile also applies to the statements of the guards, because of his poor coping skills and his excessive rumination and his hallucinatory behavior," and that "the nexus *** is that people who have poor coping skills, try different strategies, and—and people make false confessions, and make false statements." Counsel emphasized that the theory of defense was that the defendant's hand

"brushed the front of [M's] diaper, and that what it was in fact, was an accidental touching, but that [defendant], because of his excessive rumination, as described by Dr. Callum, his poor life skills, his poor coping skills, his poor understanding of the way things work, I believe she described him as being very simplistic, he began ruminating over that and wondering because of his familial origin, if he was turning into the kind of person that would do something like this to his daughter."

Counsel added that he was "not just coming up with this"; when defendant was evaluated by a different psychologist, Dr. Czar, defendant had denied any sexual motive in the touching and had insisted that "what he said to Dr. Callum, which was 'I had bad thoughts,' was something that he and his wife hatched together to get him services. That he was concerned, that because of his

family origin, that he might have a subconscious motive that was in play."

Defense counsel explained that the "thrust of our case" was that, because of defendant's "poor coping skills, excessive ruminating, which is what Dr. Callum described, adjustment disorders," he deferred to his wife and signed the confession when she presented it, "because his overwhelming concern was, 'I'll do whatever you guys want me to do, I just want to see my children again. If you—if you want me to have treatment, I'll do treatment. I just want to see my kids again.'" Counsel further explained that, "under our theory, that he has poor coping skills and makes bad choices because of poor coping skills, which [Callum] testified to, that occurs in false confession cases."

The trial court ultimately agreed with the state and ruled that Callum "cannot get into his psychological diagnosis or profile." The court concluded that the "diagnosis is [not] helpful to the jury. There's no nexus between that diagnosis and the defense in this case."

### D.  *The State's Evidence at Trial*

At trial, the state offered evidence of defendant's statements to S about touching M and having sexual thoughts about his children, the signed document, evidence of defendant's statements to the deputies, and testimony from M that defendant had sexually abused her.

### E.  *Defendant's Trial Testimony*

In his trial testimony, defendant contradicted much of the testimony by the state's key witnesses, as well as parts (detailed below) of Callum's pretrial testimony. With respect to S's testimony about the day that he left the marital home, defendant acknowledged that he was very emotional when S came home and that he had thoughts about "my cousin and my mom being molested as a kid, and I felt that that was pretty disgusting." He testified, however, that he told S that he only accidentally had touched M's diaper while pulling up her covers and that S "freaked out." Defendant insisted that he "really didn't think much of it other than the fact it was an accident" and that he took off his ring and left the house because of S's reaction. He described his thoughts as, "[Y]ou

know, you're freaking out at me, I'm done, I'm going to walk away here." Defendant further testified that he had not seen the purported written confession until it was provided to his attorney during discovery and that his apparent signature on that document had been forged.

Defendant further testified that he had not been under stress when he spoke to the deputies while in jail and that, although he had told them that he had touched his daughter, he had not said anything about "private parts."

With respect to his disclosures to Callum during counseling, defendant testified that he had never had inappropriate thoughts about children but that he and S had agreed that he would tell Callum otherwise to avoid telling her about the touching incident, which defendant feared Callum might have to report to the authorities. Defendant also denied that sexual abuse was a "hot button" issue for him in light of his family history.

In sum, defendant testified that he lacked a sexual motive when he accidentally touched M, that he had not made any incriminating statements to S, that the purported written confession was a forgery, that he had not admitted touching M's private parts to the deputies, and that he had falsely told Callum that he had inappropriate thoughts about children. The jury found defendant guilty of first-degree sexual abuse, and he appealed from the ensuing judgment of conviction.

F.  *The Court of Appeals Decision and Arguments on Review*

On defendant's appeal, the Court of Appeals reversed. In concluding that the trial court had erred in excluding Callum's testimony, the Court of Appeals explained that "the record supplies a nexus between Callum's testimony about defendant's adjustment disorder and its effect on defendant." *State v. Jesse*, 275 Or App 1, 16, 362 P3d 1187 (2015). The Court of Appeals explained that defendant's theory of the case was that he had obsessed over an accidental touching of his daughter and then was "overwhelmed by the stress," causing him to confess falsely. *Id.* at 15-16. In the court's view, Callum's "testimony was consistent with and would have bolstered that theory, providing a scientific

basis—an adjustment disorder that made defendant susceptible to rumination and obsessive thinking, and left him with very poor coping skills—to help explain what would be a highly unusual reaction to an accidental touching." *Id.* at 16. That is, the Court of Appeals viewed Callum's testimony as sufficient to support a factfinder's determination that defendant's written and oral statements were not "true admission[s] of guilt." *Id.*

On review, the state asserts that the trial court properly excluded Callum's testimony under OEC 702 on the ground that it was unhelpful. The state points out that Callum did not testify that defendant's disorder was of a sort that has been observed by experts as likely to cause "false confessions," nor did she describe any indicia that a factfinder could use to determine whether defendant's admissions were linked to his disorder. The state reasons that,

> "[w]ithout that type of testimony, the expert left the [factfinder] to speculate as to whether defendant's disorder could have caused him to confess falsely—a matter which requires the application of expertise regarding that disorder and its presentation among those afflicted with it. As a result, the proffered testimony was not helpful under OEC 702 and therefore inadmissible under that rule."

Defendant responds that the Court of Appeals correctly concluded that the trial court had erred in excluding Callum's testimony.

## II. ANALYSIS

### A. *The Helpfulness Inquiry Under OEC 702*

As noted, OEC 702 provides:

> "If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise."

In *State v. Brown*, 297 Or 404, 687 P2d 751 (1984), this court explained the nature of the requirement in OEC 702 that, to be admitted, scientific evidence must "assist the trier of fact to understand the evidence or to determine a fact in issue."

"Under the Oregon Evidence Code and traditional evidence law, expert testimony is admissible if it is relevant under OEC 401 and will help the trier of fact in deciding a disputed issue. To be helpful [under OEC 702], the subject of the testimony must be within the expert's field, the witness must be qualified, and the foundation for the opinion must intelligibly relate the testimony to the facts. If these conditions are satisfied, the testimony will be excluded only if it is unduly prejudicial, repetitive, or falls under some other exclusionary provision as provided in OEC 403."

*Id.* at 409.[3]

To be helpful, expert testimony must assist a trier of fact to understand the evidence or determine an issue of fact that it may not be able to understand or determine as well on its own. *See Yundt v. D & D Bowl, Inc.*, 259 Or 247, 258, 486 P2d 553 (1971). As examples, expert testimony can be helpful by:

"'(1) supplying general propositions which will permit inferences from data which the trier of fact would otherwise be forced to find meaningless; (2) applying general propositions to data so as to generate inferences where the complexity of the body of propositions applied, the difficulty of the application, or other factors make the expert's conclusion probably more accurate or precise than that of the trier of fact; (3) modifying, qualifying, and refining general propositions which the trier of fact may reasonably be expected to use; and (4) adding specialized confirmation and, thus, confidence to general propositions otherwise likely to be assumed more tentatively by the trier.'"

*State v. O'Key*, 321 Or 285, 298, 899 P2d 663 (1995) (quoting John William Strong, *Language and Logic in Expert*

---

[3] The parties appear to assume—and we agree with the premise—that Callum's testimony amounted to "scientific evidence." *See, e.g.*, *State v. Milbradt*, 305 Or 621, 631, 756 P2d 620 (1988) (treating testimony of expert about child victims' normal reactions to sexual abuse as "scientific evidence"). Of course, other requirements for the admission of scientific evidence also exist. Most notably, "[u]nderpinning the entire admissibility analysis * * * is the requirement that the evidence be shown to be scientifically valid." *State v. Perry*, 347 Or 110, 121, 218 P3d 95 (2009); *see also Marcum v. Adventist Health System/West*, 345 Or 237, 245, 193 P3d 1 (2008) (so holding); *O'Key*, 321 Or at 301 n 19 ("[S]cientific validity [is] the linchpin of admissibility."). However, because the state's challenge is narrow, focusing only on the helpfulness requirement, we do not address the other foundational requirements for the admission of such evidence.

*Testimony: Limiting Expert Testimony by Restrictions of Function, Reliability, and Form*, 71 Or L Rev 349, 360 (1992)).

In this case, defendant asserts that Callum's testimony would have helped the jury by having a tendency to "modify" or "qualify" a "general proposition" that the jury may reasonably have been expected to use in this case, namely, that a person who appears to admit guilt of an offense likely is guilty.[4] This court has discussed the helpfulness of expert testimony offered for analogous purposes in two prior decisions that are instructive here.

*State v. Middleton*, 294 Or 427, 429-30, 657 P2d 1215 (1983), involved a social worker's expert testimony that the victim's reaction to rape was typical of most victims of familial sexual abuse. The victim testified at trial that the defendant—her father—had raped her. The defendant, who denied that the rape had occurred, introduced statements by the victim that were inconsistent with her claim of rape. In rebuttal, two social workers testified regarding the reactions of young victims of family sexual abuse. One of the social workers testified that the victim's behavior was typical of most victims. The defendant challenged the admission of that testimony at trial on the ground that it was not helpful to the jury. *Id.* at 434. This court concluded that the testimony was admissible because it could help the jury better assess the victim's credibility by explaining her "superficially bizarre behavior[, *i.e.*, making inconsistent statements about whether the rape occurred,] by identifying its emotional antecedents." *Id.* at 436.

In [*State v. Gherasim*](), 329 Or 188, 190, 985 P2d 1267 (1999), a rape prosecution, the victim had identified the defendant as her assailant, but the defendant asserted

---

[4] Defendant also briefly asserts, without elaboration, that Callum's testimony would have provided the jury with evidence that it could use to confirm defendant's explanation of his behavior, thereby (in the words of *O'Key*, 321 Or at 298) "adding specialized confirmation *** to general propositions otherwise likely to be assumed more tentatively by the trier." Because defendant has not developed that argument by identifying, for example, what general proposition Callum's testimony would have confirmed that, without that testimony, the jury was likely to have "assumed more tentatively," we do not consider that argument further.

that someone else had assaulted the victim and he merely arrived at the scene and attempted to help her. The defendant proffered the testimony of a psychiatrist that the victim experienced dissociative amnesia, which had caused her to be confused and unable to recall the events of the assault accurately at trial. *Id.* at 192. The state objected, and the trial court allowed an offer of proof, which went into the specifics of what aspects of the victim's behavior suggested the presence of dissociative amnesia. The trial court ultimately excluded the testimony. *Id.* at 196. This court reversed, concluding that the expert's testimony would have been helpful because the expert "would have testified that, in his opinion, the victim suffered from dissociative amnesia and that that condition affected her capacity to remember what had occurred on the night that she was assaulted." *Id.* at 198.

In both *Middleton* and *Gherasim*, this court concluded that expert testimony that modified inferences that the jury otherwise might be expected to draw from the evidence satisfied the helpfulness standard. Implicit in both holdings were determinations that the testimony intelligibly related to a provable fact. *See Brown*, 297 Or at 409 (stating that foundation for expert testimony must intelligibly relate testimony to provable facts). That aspect of helpfulness refers to the relationship—that is, the relevance—that expert testimony must bear to a fact in issue. *See State v. Guzek*, 322 Or 245, 251, 906 P2d 272 (1995), *vac'd on other grounds*, 336 Or 424, 86 P3d 1106 (2004) ("'Relevancy is not an inherent characteristic of any item of evidence but exists only as a relation between an item of evidence and a matter properly provable in the case.'") (quoting OEC 401 Commentary, *reprinted in* Laird C. Kirkpatrick, *Oregon Evidence* 104 (2d ed 1989)). This court's separate references in *Brown* to the basic relevance requirement of OEC 401 and the proposition that, to be helpful, expert testimony must intelligibly relate to a provable fact, should not be understood to have created a heightened relevance requirement for expert testimony. Instead, the "intelligibly relate" reference gives voice to the unsurprising intuition that, to help a trier of fact understand the evidence or decide a fact in issue, expert testimony must relate to the fact in an understandable way. *See State v. Wright*, 323 Or 8, 17-18, 913 P2d

321 (1996) (stating that helpfulness "subsumes" a relevance inquiry).[5]

Some expert testimony, like other forms of evidence, only conditionally relates to a fact in issue, meaning that it is relevant only if another fact—the conditional fact—is first proved. *State v. McNeely*, 330 Or 457, 462 n 5, 8 P3d 212, *cert den*, 531 US 1055 (2000).[6] We mention that wrinkle here, because defendant proffered Callum's testimony about his adjustment disorder to provide an inference that defendant did not touch M with a culpable mental state. Callum's testimony would be relevant to that fact in issue only if a conditional fact was proved, that is, that defendants' adjustment disorder influenced him to make admissions that were not actual confessions of guilt. That conditional fact—like any other fact in issue—could be established by reasonable inferences, but not through speculation. *See State v. Parker*, 235 Or 366, 381-82, 384 P2d 986 (1963).[7]

B.  *Standard of Review*

With that foundation in mind, our first task is to identify the standard that governs our review of the trial court's helpfulness ruling. As discussed, the court concluded

_____

[5] This court repeatedly has described relevancy as a component of the help-fulness analysis. *See Brown*, 297 Or at 438 ("We have set forth seven factors to be used in connection with the definition of 'relevancy' as defined in OEC 401 and to be utilized in determining the helpfulness test for expert testimony expressed in OEC 702."); *see also Marcum*, 345 Or at 243 (court must conduct relevancy analysis implicated in OEC 702's helpfulness standard); *Jennings v. Baxter Healthcare Corp.*, 331 Or 285, 302, 14 P3d 596 (2000).

[6] *See also* OEC 104(2) (if "relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition").

[7] The line between permissible inferences and impermissible speculation is difficult to articulate with precision. The federal courts usefully have described that line in these terms:

"The line between a reasonable inference that may permissibly be drawn by a jury from basic facts in evidence and an impermissible speculation is not drawn by judicial idiosyncrasies. The line is drawn by the laws of logic. If there is an experience of logical probability that an ultimate fact will follow a stated narrative or historical fact, then the jury is given the opportunity to draw a conclusion because there is a reasonable probability that the conclusion flows from the proven facts."

*Tose v. First Pennsylvania Bank, N.A.*, 648 F2d 879, 895 (3d Cir), *cert den*, 454 US 893 (1981), *abrogated on other grounds by Griggs v. Provident Consumer Discount Co.*, 459 US 56, 103 S Ct 400, 74 L Ed 2d 225 (1982).

that Callum's testimony was not helpful because it lacked a sufficient nexus to defendant's theory of defense that his apparent admissions to S and the deputies were not actual confessions of guilt. The state argues that that ruling involved an exercise of discretion. Defendant disagrees; he asserts that the ruling was based on an erroneous relevance determination that is entitled to no deference. As we now explain, we agree with defendant that, properly understood, the trial court's ruling is subject to review for legal error.

The parties' disagreement about the governing standard of review is understandable, because this court has not always clearly and consistently articulated the standard under which it reviews helpfulness rulings. In *State v. Rogers*, 330 Or 282, 312, 4 P3d 1261 (2000), this court stated that the decision whether to admit evidence under OEC 702 can present a pure question of law (such as whether an expert is qualified or whether proffered testimony is within the scope of a witness's expertise), or it can have discretionary aspects, but the court did not explore the nature of the helpfulness inquiry. In *Gherasim*, which did involve review of a helpfulness ruling, this court stated that, if a correct application of law allows for more than one choice, we review the exclusion of expert testimony under OEC 702 for abuse of discretion; otherwise we review such a ruling for errors of law. 329 Or at 198. However, the court in *Gherasim* did not expressly identify the standard of review that it applied in holding that the trial court had erred in excluding the expert testimony that the defendant had proffered.

In *Middleton*, the court suggested that a helpfulness determination can involve an exercise of discretion where the challenge to expert testimony focuses on a jury's assumed level of understanding of the evidence before it. *See Middleton*, 294 Or at 437 ("[T]here is no bright line separating issues within the comprehension of the jurors from those that are not. Generally the admission of expert testimony is within the discretion of the trial court."). In other decisions, this court has discussed the role that discretion can play in deciding whether expert testimony would assist the jury in understanding the evidence. *See, e.g.*, *State v. Stringer*, 292 Or 388, 394, 639 P2d 1264 (1982) (although discretion can play a role in helpfulness determination, discretion is

inapplicable where jury lacks expertise to understand evidence without assistance); *Yundt*, 259 Or at 258. In *Yundt*, the court explained:

> "There are situations *** where a jury clearly is not equally well qualified and needs help to find the truth. There are also situations where a jury clearly is equally qualified without help from opinion testimony such as offered here. It is the area between the clearly qualified and the clearly unqualified where the trial judge should be granted a certain latitude of decision in excluding or receiving expert opinion testimony."

*Id.* at 259. In short, this court's prior decisions discussing a discretionary standard have involved the question whether proffered expert testimony would help the jury comprehend the evidence. And, those decisions have confined the role of judicial discretion to circumstances involving factual issues neither clearly within, nor beyond, the jury's assumed level of understanding.

We conclude that the state's challenge and the trial court's ruling in this case did not implicate such an exercise of discretion. As noted, at the outset, the trial court questioned whether Callum's testimony related to a fact in issue. As its colloquy with counsel ensued, the court ultimately concluded that the evidence was not helpful because "[t]here's no nexus between [the adjustment disorder] diagnosis and the defense in this case." We understand that statement, in the context of the parties' arguments, to mean that the court excluded Callum's testimony because it did not think that that testimony sufficiently related to the fact issue for which defendant proffered it; that is, whether defendant's admissions were actual confessions of guilt. Stated differently, the court in effect concluded that defendant's proffer was insufficient to permit the jury reasonably to infer the conditional fact that his admissions were not actual confessions and, therefore, defendant had failed to establish its relationship to the ultimate factual issue of whether he acted with a culpable mental state.

Because that inquiry—like any other relevance inquiry—leads to a single correct answer, we review the court's ruling for error of law. *See Rogers*, 330 Or at 312 ("If

there is only one legally correct outcome, then 'discretion' is an inapplicable concept."); *see also State v. Barone*, 329 Or 210, 237, 986 P2d 5 (1999), *cert den*, 528 US 1086 (2000) (court reviews relevance ruling for legal error); *Delgado v. Souders*, 334 Or 122, 135, 46 P3d 729 (2002) (reviewing for legal error ruling that evidence was insufficient to support inference for which it was proffered).[8] We now consider defendant's proffer in this case through that lens.

### III. APPLICATION

Again, defendant proffered Callum's testimony to support an inference that defendant's adjustment disorder contributed to an overreaction to accidentally touching M that, in turn, contributed to his making admissions that were not actual confessions of guilt. Defendant correctly asserts that so-called false (or unreliable) confession defenses involve explaining behavior that, for most laypersons, might appear to be counterintuitive. Thus, expert testimony, if adequately grounded in specialized knowledge, can help a jury better understand such behavior. Here, Callum's qualifications as an expert witness are not in dispute, and the state does not challenge the foundation for her testimony that defendant had an adjustment disorder that caused him to ruminate obsessively, subjected him to a high level of distress, and limited his coping skills. It is also true that Callum testified that whether defendant had confessed out of distress was within the realm of possibility.

The difficulty is that Callum's testimony demonstrated only defendant's premises (that he was distressed, had poor coping skills, and obsessively ruminated), and not the inference that he wanted the jury to draw (that distressed people with poor coping skills who obsessively ruminate may make admissions that are not actual confessions of guilt). Unlike the expert in *Middleton*, Callum did not testify that defendant's adjustment disorder was of a sort that has been observed by experts to influence a person to make admissions that were not confessions of guilt. *Cf. Middleton*, 294 Or at 436 (expert's testimony that victim's behavior was typical of most victims could help jury better assess victim's

---

[8] The trial court did not base its ruling on OEC 403, nor, in light of our ground of decision, do we need to address the application of that rule in this case.

credibility by explaining her superficially bizarre behavior). Nor, analogously to the expert testimony in *Gherasim*, did Callum testify that defendant's disorder actually influenced his statements. *Cf. Gherasim*, 329 Or at 198 (testimony that victim suffered from dissociative amnesia, which caused her to be confused and unable to recall what had occurred on night she was assaulted, would have been helpful to jury). And, defendant did not seek to prove the conditional fact— that his adjustment disorder influenced his admissions—by other means. For instance, defendant did not testify that he admitted the facts he did because he was obsessively ruminating or was unable to cope.

We do not mean to suggest that evidence of the type that this court concluded was helpful in *Middleton* and *Gherasim* is necessary in every case where psychological profile evidence is proffered to support an inference that the defendant's admissions were not true confessions. Otherwise qualified expert testimony that a defendant's psychological profile can produce a false confession, when coupled with evidence of indicia that a fact finder could use to determine whether the defendant's mental disorder actually contributed to his or her making a false confession, also can be helpful to a jury. *See, e.g.*, *People v. Kowalski*, 492 Mich 106, 132, 821 NW2d 14, 31 (2012) (where, in applying Michigan's identically worded version of OEC 702, court held that psychological profile evidence was helpful to jury because expert proposed to show that "[interaction] between defendant and [police] 'was consistent with [coerced] internalized confession'").

Here, however, Callum testified only that, because of his adjustment disorder, it was within the realm of possibility that defendant confessed out of stress. She did not testify that defendant's disorder can produce confessions that are not genuine, nor did she provide any indicia that the jury could use to draw a reasonable inference that his admissions were not actual confessions. And, defendant did not proffer any other evidence from which the jury could have drawn that inference. In sum, because defendant did not connect the facets of his adjustment disorder with the conditional fact that he wanted the jury to infer, the jury would have been left to speculate about the existence of a

connection between that testimony and the issue of fact whether defendant touched M with a culpable mental state. It follows that the court did not err in excluding that testimony on the ground that it would not be helpful to the trier of fact.[9]

Although not necessary to our decision, we note an additional concern with Callum's pretrial testimony in relation to the evidence at trial. In particular, key factual assumptions underlying that testimony were inconsistent with defendant's own trial testimony. First, Callum's testimony, and indeed her diagnosis, hinged on a factual assumption that defendant testified was false, namely, that he was plagued by fears that he might inappropriately touch his children and become a sex offender like certain members of his family. As noted, defendant testified that he was never concerned with that possibility and that he had falsely told Callum otherwise; he further testified that he did not tell Callum about the incident that actually precipitated his seeking therapy—the touching incident—because he was concerned that she might have to report him to the authorities. Thus, the excluded evidence met defendant's own testimony coming and going.

Second, Callum's testimony was based on the assumption that defendant made admissions to S and the deputies because of "distress" due to his adjustment disorder, but her conclusion that he was "distressed" was based on his disclosure that he had had thoughts of inappropriately touching his children. That assumption, again, was inconsistent with defendant's own testimony. As discussed, defendant testified that he told S only that he had accidentally touched M and that the signed document that the

[9] Cases where defendants have challenged the reliability of their confessions under the identically worded FRE 702 are consistent with our conclusion. In *U.S. v. Hall*, 93 F3d 1337 (7th Cir 1996), and *U.S. v. Shay*, 57 F3d 126 (1st Cir 1995), for example, experts were prepared to provide specific testimony to the effect that the respective defendants' mental disorders made them more likely to falsely confess. *See Hall*, 93 F3d at 1341 (experts would have testified regarding the defendant's propensity to falsely confess due to a personality disorder); *Shay*, 57 F3d at 133 (expert would have testified that the defendant had a mental disorder that made him a pathological liar and caused him to make self-aggrandizing confession). In those cases, the expert testimony offered more than just abstract psychological profile information, because, in addition, it suggested "how to decide whether it fit the facts of the case being tried." *Hall*, 93 F3d at 1345.

state offered was forged. With respect to his statements to the deputies two years after the alleged abuse, defendant denied being under stress, and he testified that, although he had said that he had touched his daughter, he had not confessed to any sexual motive. In short, even if Callum's testimony otherwise might have assisted the jury to understand why—if he made them—defendant's admissions to S and the deputies were not true confessions,[10] the helpfulness of such testimony to the jury was significantly undermined by defendant's acknowledgement that he had not disclosed to Callum the real reason why he sought therapy, his testimony that he had falsely told her that he had inappropriate thoughts about touching his children, and his claims that he had not, in fact, made any admissions that involved inappropriate touching at all. In those circumstances, Callum's testimony had, at best, a confusingly tangential link to defendant's evidence at trial.[11]

In sum, we conclude that the trial court did not err in excluding Callum's testimony on the ground that it would not have been helpful to the trier of fact.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is affirmed.

---

[10] Not to put too fine a point on things, but Callum did not explain how defendant's psychological profile could cause him to make seeming admissions that were not true confessions of guilt and then deny that he had made any admissions at all.

[11] Of course, defendant's testimony was not available to the trial court when it made its pretrial ruling. Irrespective, though, of whether the trial court's ruling is regarded as (even more) correct in light of the evidentiary record at trial or, alternatively, potentially erroneous when made but ultimately harmless in light of the record at trial, the point remains the same here. Key assumptions underlying Callum's testimony were inconsistent with defendant's trial testimony in ways that supported the trial court's pretrial ruling excluding it as unhelpful.